UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | **INDICTMENT** |
| v. | § § § | [COUNTS 1-2: 50 U.S.C. §§ 1702, 1705(a), and 1705(c), IEEPA CONSPIRACY AND IEEPA VIOLATIONS; |
| ILIAS SABIROV, DIMITAR DIMITROV, MILAN DIMITROV | § § § § | COUNT 3: 50 U.S.C. § 4819(a)(2)(F), ECRA FALSE STATEMENT; COUNT 4: 18 U.S.C. § 1956, MONEY LAUNDERING] |

THE GRAND JURY CHARGES:

At All Times Material To This Indictment:

## SUMMARY

1. As described in detail below, Defendants SABIROV, D. DIMITROV, and M. DIMITROV worked together to use the Bulgarian company MTIG to receive goods from the United States that could not be shipped directly to Russia without the permission of the U.S. Government. Those goods were shipped through Bulgaria to Russia in violation of U.S. law.

## DEFENDANTS AND ENTITIES

2. Ilias Kharesovich Sabirov (SABIROV) is the manager/CEO of two Russian companies that are co-located in Moscow: Cosmos Complect and OOO Sovtest Comp.

3. OOO Sovtest Comp (SOVTEST) is an engineering company located in Moscow, Russia. The SOVTEST website claimed, among other things, to develop and produce technological equipment for electronics manufacture. SABIROV is listed as the Managing Director of SOVTEST.

1

4. Cosmos Complect (aka Kosmos Komplekt) (COSMOS) is an engineering company collocated with SOVTEST in Moscow, Russia. According to publicly available resources, COSMOS "was founded in 2011. The company's line of business includes manufacturing guided missiles and space vehicles."

5. Dimitar Dimitrov (D. DIMITROV) is a Bulgarian engineer and close associate of SABIROV. D. DIMITROV previously worked for SABIROV at COSMOS and, as of 2017, worked for the Sofia, Bulgaria company Multi Technology Integration Group EOOD.

6. Multi Technology Integration Group EOOD (MTIG) is a company located in Bulgaria that is involved in the importation and onward shipment of U.S.-origin parts and components, to include those produced by U.S. SUPPLIER 1, to Russian companies operated by SABIROV.

7. Milan Dimitrov (M. DIMITROV) is a Bulgarian engineer and works at MTIG. He is the son of D. DIMITROV. He also previously worked at COSMOS.

8. "Bulgarian Facilitator" is a Bulgarian national who is the registered owner and operator of MTIG. Bulgarian Facilitator operates MTIG from a residential apartment located in Sofia, Bulgaria.

9. U.S. Person 1 is the former CEO of U.S. Supplier 1, and was involved in communicating with and facilitating transactions with SABIROV's companies.

10. U.S. Salesman 1 is a former Vice President for International Sales at U.S. Supplier 1, and had previous business relationships with SABIROV and D. DIMITROV.

11. U.S. Salesman 2 is a former Vice President for Sales at U.S. Supplier 1.

12. U.S. Supplier 1 is a U.S. company that designs and manufactures radiation-hardened (rad-hard) and extreme temperature-hardened integrated circuit (IC) components. U.S.

2

Supplier 1 has contracted with the U.S. Air Force, NASA, and other U.S. government entities to provide these components for spacecraft and missile applications. U.S. Supplier 1 is headquartered in Austin, Texas, within the Western District of Texas. The CEO of U.S. Supplier 1 from 2015 until 2020 is identified herein as U.S. Person 2.

13. U.S. Manufacturer 1 is a U.S. manufacturing company that supplies parts to U.S. Supplier 1 to include 16Mb Static Random-Access Memory (SRAM) wafers. U.S. Manufacturer 1 is headquartered in Texas.

14. U.S. Supplier 2 is a U.S. company that obtains products from companies, including U.S. Manufacturer 1, some of which it sells through its subsidiary in the United Kingdom (U.K. Company 1). U.K. Company 1 provided goods exported from the United States by U.S. Supplier 2 to MTIG. As described below, MTIG then shipped those goods to SOVTEST in Russia.

## ECRA AND IEEPA

15. The Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801 *et seq.*, provides, among its stated policy objectives, that "the national security and foreign policy of the U.S. require that the export, re-export and in-country transfer of items, and specific activities of U.S. persons, wherever located, be controlled . . . ." 50 U.S.C. § 4811(2). To that end, ECRA grants the President the authority "(1) to control the export, re-export, and in-country transfer of items subject to the jurisdiction of the U.S., whether by U.S. persons or by foreign persons; and (2) the activities of U.S. persons, wherever located, relating to" specific categories of items and information. ECRA § 4812(a).

16. Pursuant to ECRA § 4819(a)(1), it is "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this [part] or of any regulation, order, license,

3

or other authorization issued under this [part]," and pursuant to Section 4819(b),"[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall" be guilty of a crime.

17. Pursuant to ECRA, and before ECRA's enactment on August 13, 2018, under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, the Department of Commerce, Bureau of Industry and Security ("BIS"), reviews and controls the export of certain items, including goods, software, and technologies, often called dual-use goods, from the U.S. to foreign countries through the Export Administration Regulations (EAR), 15 C.F.R. §§ 730-774. In particular, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the U.S.

18. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States, re-exported from one foreign destination to another, and from the United States through one foreign destination to another. Under the EAR, an export that will transit through a country or countries to a destination identified in the EAR is deemed to be an export to that ultimate destination. 15 C.F.R. § 734.13(c).

## BACKGROUND INFORMATION

19. At all times relevant hereto, the 16Mb SRAM Wafers at issue sold by U.S. Supplier 1 to SABIROV and D. DIMITROV and their companies were designated under Export Control Classification Number (ECCN) 9A515.e.1 (Category: Spacecraft and related components) based on their radiation- and temperature-hardened characteristics. An export license is required to

export the SRAM wafer and SRAM wafers cut into individually integrated circuits, or DIE, to Russia for reasons of Regional Stability.

20.     At all times relevant hereto, the 180 components at issue received by MTIG from U.K. Company 1 and manufactured by U.S. Manufacturer 1 were designated under ECCN 3A001.a.2.a. (Category: Electronic Items). An export license is required to export these components to Russia for reasons of National Security.

## OVERT ACTS AND SIGNIFICANT EVENTS

**A.     Procurement from U.S. Supplier 1**

21.     In May 2014, SABIROV, D. DIMITROV, and U.S. Salesman 1 agreed to meet at U.S. Supplier 1's offices in Austin, Texas. SABIROV requested the meeting in Austin to discuss the purchase of rad-hard integrated circuits for use by SABIROV's company, COSMOS. At the meeting in Austin on or about May 12, 2014, SABIROV and D. DIMITROV were informed by U.S. Person 1 that U.S. Supplier 1 could not ship electronic components to Russia because of U.S. trade restrictions.

22.     On May 20, 2014, SABIROV, using his COSMOS email account (ilias@coscom.ru), sent an email to U.S. Person 1, and copied U.S. Salesman 1, as a follow-up to the May 12, 2014 meeting. In this email, SABIROV requested a quote for numerous parts. On May 28, 2014, SABIROV received U.S. Supplier 1's quote for more than $6.7 million worth of parts to include the rad-hard 16Mb SRAM wafers. SABIROV was advised by U.S. Supplier 1 that all of the quoted devices were "subject to US export regulations," and specifically controlled under U.S. Department of Commerce regulations.

23. During a subsequent conference call with the management at U.S. Supplier 1, on or about August 19, 2014, SABIROV advised U.S. Supplier 1 that he had established a new company in Bulgaria, called MTIG.

24. On or about August 20, 2014, SABIROV sent an email to U.S. Supplier 1 executives and copied both D. DIMITROV (office@dimitrov.ca) and Bulgarian Facilitator (info@mtig.ca) as a follow-up to the August 19, 2014, conference call and to respond to the questions posed by U.S. Supplier 1. SABIROV stated: "In this case Cosmos' role will be wafer/die-level screening and assembly of IC's and integrated systems within a package." SABIROV explained that MTIG was "more of a workshop" used to "develop and implement miniature electronic technologies" for automotive and pipeline use. He further explained that "[t]o minimize the expenditure [Bulgarian Facilitator] founded MTIG as a centralized bureau for communication with different outsource services" and that "[D. DIMITROV] and myself provided a business loan for start-up as well as proposed to build a couple of system designs at our cost."

25. MTIG forwarded Purchase Order SST01-14, dated October 31, 2014, to U.S. Supplier 1 for the purchase of one 16Mb SRAM Wafer valued at $125,000

26. MTIG sent a wire transfer to U.S. Supplier 1 as partial payment on December 12, 2014, from Bulgaria to U.S. Supplier 1's bank in the U.S. in the amount of $87,500.

27. MTIG received a January 20, 2015, Invoice (SST0407-01) from U.S. Supplier 1 for MTIG's purchase of the 16Mb SRAM Wafer for $125,000. On or about January 31, 2015, MTIG received the 16Mb SRAM Wafer in Bulgaria from the U.S.

28. On or about March 2, 2015, MTIG entered into a written contract with SOVTEST for MTIG to deliver parts to SOVTEST, the Russian company controlled by SABIROV. The

6

contract was signed by Bulgarian Facilitator 1 on behalf of MTIG and by SABIROV on behalf of SOVTEST.

29. In three payments on March 20, April 17, and May 14, 2015, SOVTEST transferred over $1 million U.S. dollars to MTIG. In addition to other purchases, those funds were transferred to the U.S. to purchase Seam Sealing equipment, which are used to hermetically seal microelectronic packages such as integrated circuits, and Laminar flow workstations, which are designed to allow work at semiconductor wafer workstations without contamination. One of the wire transfers in furtherance of those purchases occurred on or about April 13, 2016, when MTIG made a $27,749.15 wire transfer from Bulgaria to the U.S.

30. On or about April 8, 2015, MTIG received from a company in the Czech Republic an invoice, which includes a charge of 455 Euros for providing the service of "dicing" the 16Mb SRAM Wafer shipped to MTIG by U.S. Supplier 1 in January 2015 into 115 DIE.

31. Thereafter, MTIG issued Invoice #4, dated May 20, 2015, reflecting the sale of "Electronic Components" listed as "(Item # SMV512K32-SP) (16M SRAM Rev AB) QTY: 115 to SOVTEST." The invoice total purchase amount is $158,125. The MTIG Invoice shows both the "Bill To:" address and the "Ship To:" address as SOVTEST, at its Moscow, Russia address.

32. MTIG later entered into negotiations for the purchase of additional 16 MB SRAM Wafers from U.S. Supplier 1, culminating in an agreement in late 2015. On December 15, 2015, D. DIMITROV, M. DIMITROV, and the Bulgarian Facilitator received an email from U.S. Supplier 1, stating: "Dear [Bulgarian Facilitator], I just talked to Ilias [SABIROV] and we are now in agreement. I confirm hereby the price of 100k$ per wafer for PO SST01-15 of 5 wafers of 16Mv SRAM…The shipment of the first 2 wafers before the end of the year is in process as we speak."

7

33. On or about December 18, 2015, MTIG received in Bulgaria two wafers from U.S. Supplier 1. The rest of the wafers were shipped in September 2016.

34. In July 2016, U.S. Salesman 2 travelled to Bulgaria and met with SABIROV, D. DIMITROV, and M. DIMITROV. During the meeting, U.S. Salesman 2 asked SABIROV if MTIG was exporting to Russia. SABIROV replied "maybe." U.S. Salesman 2 admonished everyone that a license was needed to export the items purchased from U.S. Supplier 1 from Bulgaria to Russia. During the meeting D. DIMITROV falsely assured U.S. Salesman 2 that the 16Mb SRAM Wafers U.S. Supplier 1 previously shipped to MTIG were still in Bulgaria.

35. MTIG received from U.S. Supplier 1, in total, six 16Mb SRAM Wafers with a total value of $497,000. When diced, these wafers would likely create a minimum of 690 radiation-hardened integrated circuits.

**B.   Procurement from U.S. Manufacturer 1**

36. In 2015, MTIG issued purchase orders not only for rad-hard parts from U.S. Supplier 1, but also, at SABIROV's direction, ordered over $1.774 million in other electronic components produced by U.S. Manufacturer 1. SABIROV directed MTIG to procure specific U.S. Manufacturer 1 components in fulfillment of part of a contract signed by SABIROV for SOVTEST and Bulgarian Facilitator for MTIG. To fulfill SABIROV's order, MTIG ordered these items from U.K. Company 1, which in turn obtained them via its U.S. affiliate and U.S. Manufacturer 1. After receiving the components from the United States to fill MTIG's order, U.K. Company 1 shipped the components to MTIG in Bulgaria. After MTIG received the U.S. components, MTIG re-packaged them and sent them to Russia to SABIROV's company, SOVTEST.

37. For example, on or about June 9, 2015, MTIG received 180 components from U.K. Company 1 that were manufactured by U.S. Manufacturer 1 and which U.K. Company 1 had obtained from the United States for MTIG. On or about June 17, 2015, MTIG sent the components to SOVTEST in Moscow, Russia without obtaining the required approval from the United States.

38. Multiple payments by MTIG to U.K. Company 1 were made from Bulgaria to London, U.K. via New York, New York. For example, on or about January 12, 2015, multiple wire transfers were sent from Bulgaria totaling approximately 97,654 Bulgarian Lev (approximately $56,404 in June 2020 exchange rate) to U.K. Company 1 via New York.

C. **False Statements During Interview at MTIG**

39. On or about December 6, 2018, a Department of Commerce Export Control Officer interviewed M. DIMITROV during a Post-Shipment Verification (PSV) visit at MTIG in Bulgaria to determine if the rad-hardened wafers exported by U.S. Supplier 1 starting on or about January 31, 2015, were still in MTIG's possession. In response to a series of questions related to the purchase of the 16Mb SRAM wafers, M. DIMITROV specifically denied sending the wafers to Russia. M. DIMITROV further falsely asserted "all the wafers are here." He repeated, the "wafers are not in Russia."

40. During the PSV interview, M. DIMITROV stated that he and his brother founded MTIG in 2014 and that MTIG was opened using bank loans. M. DIMITROV also fraudulently said that there were no investors in MTIG. He claimed that he and his brother make monthly payments to the bank. SABIROV was not mentioned by M. DIMITROV in the interview.

9

## COUNT ONE
### Conspiracy to Violate IEEPA

41. Count One incorporates by reference, as if fully set forth herein, paragraphs one through forty of this Indictment.

42. Beginning sometime in or about May of 2014, the exact date being unknown, and continuing until on or about May 30, 2018, in the Western District of Texas and elsewhere, the Defendants,

**ILIAS SABIROV,
DIMITAR DIMITROV,
MILAN DIMITROV,**

did knowingly and willfully combine, conspire, and agree to violate, or cause a violation of, a license, order, regulation, and prohibition of U.S. export controls, as described above, in violation of 50 U.S.C. §§ 1705(a), 1705(c), and 1702.

## COUNT TWO
### IEEPA Violation

43. Count Two incorporates by reference, as if fully set forth herein, paragraphs one through forty of this Indictment.

44. On or about May 20, 2015,

**ILIAS SABIROV,
DIMITAR DIMITROV,
MILAN DIMITROV,**

did knowingly and willfully cause violations of a license, order, regulation, and prohibition of U.S. export controls, as described above, that is the exportation of 16MB SRAM Wafers to Russia via Bulgaria without the required license, in violation of 50 U.S.C. §§ 1705(a), 1705(c), and 1702.

## COUNT THREE
### ECRA False Statement

45.     Count Three incorporates by reference, as if fully set forth herein, paragraphs one through forty of this Indictment.

46.     On or about December 6, 2018,

**MILAN DIMITROV,**

did knowingly and intentionally make a false or misleading representation, statement, and certification, and falsified and concealed a material fact, as described above, to the U.S. Department of Commerce in the course of an investigation or other action subject to the Export Administration Regulations, in violation of 50 U.S.C. § 4819(a)(2)(F).

## COUNT FOUR
### Money Laundering

47.     Count Four incorporates by reference, as if fully set forth herein, paragraphs one through forty of this Indictment.

48.     Beginning sometime in or about May of 2014, the exact date being unknown, and continuing until on or about May 30, 2018, in the Western District of Texas and elsewhere, the Defendants,

**ILIAS SABIROV,
DIMITAR DIMITROV,
MILAN DIMITROV,**

did knowingly combine, conspire, and agree to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, namely: to knowingly transport,

transmit, transfer and attempt to transport, transmit, transfer funds and monetary instruments, from a place in the United States to a place outside the United States or from a place outside the United States to a place inside the United States, with the intent to promote by the purchase of the Seam Sealing Equipment and the Laminar Flow Work Stations the carrying on of specified unlawful activity, that is the IEEPA violations as described in this Indictment, in violation of 18 U.S.C. § 1956(a)(2).

All in violation of 18 U.S.C. § 1956(h).

A TRUE BILL.

**ORIGINAL SIGNATURE REDACTED PURSUANT TO E-GOVERNMENT ACT OF 2002**

JOHN F. BASH
United States Attorney

By: _____
MICHAEL C. GALDO
G. KARTHIK SRINIVASAN
Assistant United States Attorneys

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>**Plaintiff**<br>v<br><br>**MILAN DIMITROV**<br>**Defendant** | NO. A-20-CR-173-RP-3 |

## MOTION FOR DETENTION OF DEFENDANT

The government seeks pretrial detention under Title 18, United States Code, Section 3142, et seq., and would show the Court the following:

1. The pending case involves:

   [ ] (a)   A crime of violence; 18 U.S.C. § 3142(f)(1)(A).

   [ ] (b)   An offense for which the maximum sentence is life imprisonment or death; 18 U.S.C. § 3142(f)(1)(B).

   [ ] (c)   An offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, the Controlled Substances Import and Export Act or the Maritime Drug Law Enforcement Act; 18 U.S.C. § 3142(f)(1)(C).

   [ ] (d)   A felony committed after the Defendant had been convicted of two or more prior offenses described in Title 18, United States Code, Section 3142(f)(l)(A)-(C) or comparable state or local offenses.

   [ ] (e)   A felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device or any other dangerous weapon or involves the failure to register under section 2250 of title 18, United States Code; 18 U.S.C. § 3142(f)(1)(E).

   [X] (f)   A serious risk that the Defendant will flee; 18 U.S.C. § 3142(f)(2)(A).

[ ]  (g)  A serious risk that the person will obstruct or attempt to obstruct justice, or attempt to threaten, injure or intimidate a prospective witness or juror; 18 U.S.C. § 3142(f)(2)(B).

[ ]  (h)  An offense committed by the Defendant while released pending trial or sentence, or while on probation or parole and the person may flee and/or poses a danger to another person and/or the community requiring an initial 10-day detention pursuant to 18 U.S.C. § 3142(d).

[X]  (i)  An offense committed by the above named defendant who is not a citizen of the United States or lawfully admitted for permanent residence and the person may flee requiring an initial 10 day detention under the provisions of 18 U.S.C. § 3142(d).

2.  No condition or combination of conditions will:

[X]  (a)  Reasonably assure the appearance of the person as required.

[X]  (b)  Reasonably assure the safety of the community or any other person.

3.  The United States may advocate additional reasons for detention other than those indicated above as the investigation proceeds and new information becomes available.

4.  Pursuant to 18 U.S.C. § 3142(f) the United States moves that the detention hearing be continued for **TEN (10)** days so that the United States can prepare for said hearing.

5.  The Government requests that the Defendant be held without bond.

               Respectfully submitted,

               JAIME ESPARZA
               UNITED STATES ATTORNEY

       By: /s/ Justice Jane
          JUSTICE JANE
          Assistant United States Attorney
          Bar No. VA75696
          903 San Jacinto Blvd., Suite 334
          Austin, Texas 78701
          Office  (512) 916-5858
          Fax    (512) 916 5854
          Michael.Galdo@usdoj.gov